CONTINENTAL RESEARCH, INC., a Minnesota corporation, Plaintiff,

v.

CRUTTENDEN, PODESTA & MILLER, a partnership residing in the State of Illinois, and Robert A. Podesta, Ernest A. Mayer, John Doe and Richard Roe, individual members of said partnership, Defendants.

No. 4–62–Civ. 353.

United States District Court
D. Minnesota,
Fourth Division.

Sept. 27, 1963.

Julius F. Bonello, Minneapolis, Minn., for plaintiff.

Henry Halladay and Robert J. Struyk, Minneapolis, Minn., for defendants.

LARSON, District Judge.

The plaintiff, Continental Research, Inc., is a Minnesota corporation with its home office in Golden Valley, Minnesota. The defendant Cruttenden, Podesta & Miller, a securities dealer and broker, was at the times relevant herein a partnership with its home office in Chicago, Illinois.

This is an action in tort for interference with or inducing the breach of a contract between the plaintiff and Harold E. Wood & Company, a Minnesota corporation, with its home office in St. Paul, Minnesota. The legal issues involve the interaction of three sets of events: (1) dealings between the plaintiff and the Wood Company, (2) dealings between the Wood Company and the defendant, and (3) the changes which took place in the national and local securities markets in 1962.

The plaintiff corporation was organized on January 16, 1962, by members of a joint venture which had been formed June 24, 1961, to assist Ned Owens in the development of the invention of an oxygen dispenser. Mr. Owens, a naval aviator in World War II, had become interested in oxygen not only for its high altitude uses, but for its other beneficial effects on the human system. On November 27, 1961, the group applied for a patent on the product, the application for which was still pending at the time of trial. The corporation decided that it would raise the capital necessary to begin

production and marketing of the product by selling stock to the public. In pursuit of this goal the plaintiff began discussions with officers of the Wood Company in the latter part of January, 1962. The Wood Company told the plaintiff that the proposed issue had good qualities and should be priced at the $5.00 per share level. On February 1, 1962, the president of the Wood Company, Leo Quist, met with Ned Owens, now president of the plaintiff, and others in the plaintiff corporation to discuss the type of selling agreement to be entered into. The two alternatives available to the plaintiff were either an underwriting contract or a best efforts contract. Under the former the Wood Company would have paid the plaintiff the total dollar amount of the stock issue, which was $250,000, and then would have proceeded to sell the stock to the public at its own risk. Under the latter plan the plaintiff would receive no firm commitment, the risk of the stock sale resting on the issuer. The plaintiff urged the Wood Company to underwrite the issue, stating that it could muster a nucleus of "sophisticated" investors which would insure the success of the issue, but the Wood Company chose to become the selling agent only on a "best efforts" basis. The Wood Company's president testified that although he was quite optimistic about the market at the outset of the year 1962, he began to be concerned after the major steel companies announced an across-the-board price increase in the spring of 1962 but then withdrew the increase. The plaintiff and the Wood Company signed the selling agreement on April 2, 1962, under which the issuer offered 50,000 shares of common stock at a price of $5.65 per share, $0.65 of which would go to the Wood Company as its commission. The offering was registered by the Minnesota Securities Commissioner on May 15, 1962. The issuer wished to comply with the Federal securities law by proceeding under a Regulation A exemption. There was delay in the completion of the Offering Circular in satisfactory form and approval from the Chicago office of the Securities and Exchange Commission was not obtained until August of 1962. This approval, which under Regulation A takes the form of a so-called "no comment letter," was given on August 22 to be effective on August 27. The Offering Circular, dated August 27, 1962, and which is the only permissible selling literature other than the tombstone ad, was then in final form. On August 27, 1962, the so-called tombstone ad, a brief announcement of the offering, was run in the major morning and evening papers in the Minneapolis-St. Paul metropolitan area and an investment publication. The officers and salesmen of the Wood Company also commenced their personal selling efforts, which usually took the form of first sending the offering circular to a prospective buyer and then contacting him later either on the telephone or in person. The selling agreement between the plaintiff and the Wood Company required the latter to use its best efforts for ninety days from the first day of selling, August 27, here. Although more than $20,000 worth of stock was sold through the Wood Company, the only persons to whom sales were made were people whose names had been furnished to the Wood Company by the plaintiff. These people were all friends or relatives of plaintiff's promotion group. Numerous other persons in the metropolitan area who were described as "sophisticated" investors were contacted by the Wood Company's sales force, but not one of them finally bought any of the plaintiff's stock.

Prior to 1961 Harold E. Wood, founder of the Wood Company, had been a long-time friend of Robert Podesta, managing partner of the defendant. Mr. Podesta was in Denver, Colorado, when he learned that Harold Wood had been killed on October 7, 1961, in an automobile accident. He called Leo Quist, whom he also knew, to inquire about the well-being of the deceased's family, to express his sorrow over the accident, and to inquire generally of the future plans of the Wood Company. The nature of the defendant's operation is such that it

is always looking for ways to expand its branch offices. Mr. Podesta and Mr. Harold Wood over the years had frequently mentioned the possibility of affiliating, but no serious negotiations had ever been undertaken. In his telephone conversation with Mr. Quist, Mr. Podesta told him that if he later considered an affiliation with a larger securities concern, Mr. Podesta would appreciate Mr. Quist's calling him in Chicago. Mr. Quist did not contact Mr. Podesta immediately.

For several years prior to 1962 the securities market for "local" issues had been good in the metropolitan area of Minneapolis-St. Paul. A "local" issue is stock in a corporation which has its home office here. Numbers of issues in new and unseasoned business ventures were offered to the public with considerable success. At the outset of 1962 the national securities market was enjoying prosperity; the Dow-Jones averages (indicating the relationship of current prices to prices in former years) were high and the volume of sales was substantial. During the spring of 1962 the market apparently wavered slightly, reflecting some concern over the unsuccessful attempt of the major steel companies to raise their prices, but continued relatively strong into the month of May. The market situation changed drastically in the latter part of May. On May 28 prices fell sharply on the New York Stock Exchange and other exchanges. Prices rapidly declined elsewhere; both national and local issues were hit hard by a wave of pessimism which swept the country. The "big break" caused several things to happen insofar as the parties in this case are concerned.

The dealings between the plaintiff and the Wood Company were affected because sophisticated investors had neither the financial interest nor the financial means to purchase the stock being offered by the plaintiff. A sophisticated investor was described in various ways by experts at the trial. His sophistication was alternatively described to be a function of his knowlege of the market, his general economic position in life, or his current tax situation in regard to capital gains and losses. One expert said that a sophisticated investor was one who knew as much about the market as the salesman who came to call on him; he fully appreciated the risks involved in untried corporations without being given a full and formal disclosure. Another described a typical sophisticated investor as a man in business with a large current income who invested some of his funds in proven securities but also had funds with which to speculate. A third description portrayed a man who will buy speculative issues because he has large capital gains and does not object to some losses due to his high tax bracket. By August 27, 1962, a number of these people had no unrealized capital gains and in many cases their paper gains had turned to losses, unrealized or otherwise. This took away the tax incentive for buying a stock such as that being offered by the plaintiff, which was uniformly described as a speculative issue. Also, for those who had the means to buy, there were numerous local issues with proven success and established earnings record which were selling at 50%-60% of their price level of some three months before. These established issues were being offered (though seldom taken) at the same general price level at which the plaintiff's stock was being offered. Although most of the witnesses who professed to know anything about initial offerings of unseasoned corporations said that the plaintiff's product was above average in potential, they all agreed that sale of that type of an issue in the fall of 1962 through normal channels was flatly impossible. There was little demand for any sort of stock but no demand for an untried local issue. The decline in the price level of nationally listed securities "bottomed-out" in the summer and the Dow-Jones averages began to climb in the fall, but this was only because of the need for large institutional investors such as mutual funds, insurance companies and pension trusts to keep their money invested. This type of

investor bought only the listed securities, however, and this cushioning effect did not reach to the unlisted local issues. Even on the national exchanges the volume of sales that was formerly enjoyed has not yet returned, even though the averages are up. The testimony reflected a feeling that the national market is a picture of glowing prosperity in comparison to the local market. Local issues are traded only on order. The brokers who formerly endeavored to "make a market" in these issues by buying them for their account and reselling them have abandoned this practice, if they are still in business. The overwhelming pessimism as to local issues was the reason that the efforts of the Wood Company did not produce the sale of a single share of the plaintiff's stock except to friends and relatives of plaintiff's original promotion group. Thurston Wood, son of the deceased founder, said that he attempted to line up some "fence-riders" but was not successful. Fence-riders were described as persons who would indicate a tentative interest in coming in on the venture if enough other subscribers could be lined up to assure 100% subscription of the issue. There was no provision for escrow of partial subscriptions for refund in the event that the issue was not wholly subscribed. This feature of the offering seems to have caused other difficulties, which are described later. Although both Thurston Wood and Leo Quist originally indicated an interest in making substantial investments in the plaintiff's stock, neither of them ultimately bought any of the stock, due partly to the escrow feature and partly to the general market situation.

The dealings between the Wood Company and the defendant were also critically affected by the change in the market picture. When Mr. Podesta called Leo Quist on November 10, 1961, and inter alia, expressed an interest in having the Wood organization become affiliated with the defendant's organization, Leo Quist did not call him back for some time. The Wood Company was reorganized with Mr. Quist as its president, and enjoyed a profit in December of 1961 of $22,637.34 and a profit of $2,965.04 in January of 1962. This was followed by losses in February and March of $1,385.93 and $15,942.60. A small profit of $377.18 in April was followed by losses in May, June, and July of $9,871.99, $13,127.85 and $7,599.46, respectively. During the financially gloomy months following May 28, 1962 the Wood Company considered several ways of turning the ebbing tide. The Wood Company considered joining the New York Stock Exchange, hoping that the ability to sell nationally listed securities would enable it to keep going, but this plan was not accomplished. The severe and continuing losses compelled action of some sort by the directors and stockholders of the Wood Company. Other brokers and dealers were also faced with similar problems. The firm of Craig-Hallum Kinnard, Inc., which had apparently had some negotiations or agreement with the Wood Company as to some sort of a participation in the selling of the plaintiff's stock, in September of 1962 cut back the number of its personnel and also curtailed its policy of offering untried local issues. One witness testified that about fifteen or twenty small securities concerns had started into business in the flourishing local market of 1959 and 1960, but approximately twelve to fifteen of them had dropped out since then. Another witness said that several old and well established financial firms had either merged or gone out of business because of the extremely low volume of sales. The directors of the Wood Company apparently felt that in this sort of a pessimistic market the Wood Company could not survive alone. Mr. Quist testified that the common stock equity in the Wood Company was wiped out and that he had no money or interest in keeping the company going. He remarked drily that the Wood Company was an "expensive luxury" that he could not afford. In August of 1962 he went to see Mr. Podesta in Chicago and informed him that the Wood Company was retiring

from business and that its assets were for sale. The defendant at that time had an office in the same building that the Wood Company occupied in St. Paul. The defendant at that time had two salesmen in this office with room for two more. The Wood Company had eight men qualified to sell securities at this time. The defendant had previously considered hiring more men and expanding its St. Paul office.

It is apparently the practice in the securities business that when one concern wishes to become affiliated with another, the former buys the tangible assets of the latter rather than engaging in a legal merger. This is done partly for the reason that the acquiring concern does not wish to assume the obligations, contingent or otherwise, of the acquired business, the Wood Company here. The tax laws also do not allow depreciation of good will as a business expense under Section 162 of the Internal Revenue Code. For these and perhaps other reasons the negotiations between the Wood Company and the defendant were designed to lead to a purchase of the Wood Company's tangible assets, which consisted mostly of office furniture and equipment and leasehold improvements. However, in this transaction the defendant was definitely concerned with whether or not the salesmen employed by the Wood Company would continue with the defendant. The reason is that the retentionor acquisition of the trained salesmen with established clienteles was definitely something of value, even though that something cannot be sold (because the salesmen are free agents) and would not be bought (because of the tax laws) even if it could be sold. The understanding that the Wood Company's salesmen, or most of them, would continue with the defendant after the so-called "buy-out" was the central reason for the culmination of the transaction, once the negotiations had been initiated in 1962 by the Wood Company. Thurston Wood testified that the understanding that the Wood Company's salesmen would come along with the deal was Leo

Quist's "main sales pitch" when he contacted Mr. Podesta in Chicago in August of 1962. Mr. Quist said that he assured the defendant that most of the Wood Company's employees would come with the defendant, but pointed out that there was no requirement to this effect. Mr. Mayer, who was in charge of sales for the defendant, testified that he "expected" all of the Wood Company's men to have their licenses transferred and come to work for the defendant. This was apparently arranged in a meeting that Mr. Mayer had with the Wood Company's sales force prior to September 29, 1962. Mr. Podesta testified that if he had not been assured that most of the Wood Company's sales force was coming with the defendant's organization, he would not have gone through with the deal. He said that they did their best to get the Wood Company's salesmen to come with them. When all of the preliminary matters were completed to the defendant's satisfaction, it made an offer to the Wood Company in a letter dated September 29, 1962, in which the terms of the transaction were outlined. The offer stated that the assets would be purchased no later than October 15, 1962. The offer seems to have been accepted no later than October 4, 1962, for Mr. Quist on October 5, 1962, wrote Mr. Owens, the plaintiff's president, and advised him that the Wood Company was consolidating with the defendant on October 15, 1962; that the defendant had been told of the contract between the Wood Company and the plaintiff during the negotiations; that the defendant had said that it would "carry the ball for you" if the issue could be qualified in the State of Illinois; that Mr. Robert Podesta had advised him in a letter received October 4, 1962, that the issue would not qualify in Illinois; and that he (Leo Quist) had contacted Craig-Hallum, Kinnard, Inc., relative to their taking over the selling agreement. As this point the Wood Company could not now perform its contract with the plaintiff, though the plaintiff did not immediately learn this. The reason, not expressed in that particular let-

ter, was that the Wood Company's entire sales force was going to work for either the defendant or for some other financial institution and would no longer be licensed to sell for the Wood Company. Although the officers of the Wood Company had not needed a license to sell for their company under Minnesota law, the State Securities Commissioner would not allow a person to sell securities as an officer of one company (though unlicensed) and a licensed salesman for another. Though the law did not expressly forbid this it was testified that one such situation had been "corrected."

When the full import of the consolidation between the Wood Company and the defendant was grasped by the plaintiff and its counsel, they were extremely concerned as to the future of both the issue and ultimately the corporate venture itself. This grave anxiety was manifested in numerous letters, phone calls, and telegrams, most of which were directed from the plaintiff's counsel to Mr. Mayer, a general partner in the defendant's Chicago office. These communications began about October 19 and continued until November 20, 1962. Their general theme was to the effect that the plaintiff wanted someone to sell its stock under any feasible plan. There are a number of these communications in the record. They reflect moods, varying from doubt and concern at the outset to gloom and despair at the end, for the plaintiff's financial future. The plaintiff's counsel was apparently first led to believe that four members of the Wood Company would continue with their best efforts to sell the plaintiff's stock until the end of 1962, but Mr. Arthur Reiter in the Minnesota Commissioner of Securities' office told counsel that the four officers of the Wood Company could not do this if they were licensed to sell for the defendant. All of the Wood Company's officers and salesmen still remaining on the payroll did, in fact, obtain licenses to sell for the defendant by October 22, 1962. By October 23 the plaintiff's counsel learned that Craig-Hallum, Kinnard, Inc., would not be able to assist in the sale. The subsequent efforts of the plaintiff's counsel to persuade the defendant to assist the sale in some way were to no avail. The plaintiff's counsel was led to believe that the defendant was not permitted to engage in this sort of financing by the rules of the various exchanges of which the defendant was a member. It was also stated to the plaintiff's counsel that the defendant felt that the issue would not qualify under Illinois law. The plaintiff's counsel consulted with the new manager of the defendant's St. Paul office, the law firm that had represented the Wood Company in its dealings with the plaintiff, and also had some conversations with Mr. Mayer in the defendant's Chicago office that left counsel unsure of the over-all situation. The whole affair finally came to a halt with no one selling any more stock. The people who had purchased stock did not get their money back, and the plaintiff remains laden with debts.

At the trial both Mr. Mayer and Mr. Podesta of the defendant firm testified at some length as to why they did not undertake to sell the plaintiff's stock when the contract was made known to them by the Wood Company and when the plaintiff's counsel later urgently requested that the defendant do so. It was first pointed out that the defendant did not feel legally obligated to do so, as the defendant had only purchased the assets of the Wood Company, as was its practice. It was further pointed out that the characteristics of the plaintiff's stock and the way it was being sold were such that the defendant did not wish to handle it. In this vein it was explained that it was just as costly to qualify a three million dollar offering in Illinois under Regulation A of the Federal securities law as it was to qualify a two hundred fifty thousand dollar offering. Second, the issue was of a speculative character and the defendant had adopted a policy against offering speculations because it did not wish to lose any of its customers when the issuer went broke, as new companies quite often do. In addition, the lack of a provision for escrowing the

sale proceeds until the entire amount had been sold would alone have barred the issue from qualification in Illinois. But the final and most important reason that the two witnesses gave for not wishing to take on the selling agreement was that the defendant's salesmen would not have tried to sell the stock if they had been told to do so and could not have sold the stock if they had wanted to do so. The two men said that the salesmen would have been just as concerned about their reputation as their parent organization; they would not want to sell a stock such as the plaintiff's in the market conditions that then existed.

A number of securities experts testified at the trial and the single thread that ran through all their testimony was that the plaintiff's stock was impossible to sell in the fall of 1962 due to the extremely adverse conditions which prevailed. Those who wanted local issues could find them "on the bargain counter," but very few investors were looking for this sort of stock. It was said that it is usually possible to tell fairly soon from the volume of sales whether an issue is going to be successful or not. This period was described as being from two to three days at the inside to two weeks at the outside. Thurston Wood testified in March of 1962 he thought the issue would sell in a few days. When final approval came from the regulatory agencies the Wood Company tried to sell plaintiff's stock from August 27, 1962, to approximately the fifteenth of October and never sold a single share to someone whose name had not been furnished by the plaintiff. Though the plaintiff's stock could not be legally sold before August 27, 1963, plaintiff's officers had obtained permissible "indications of interest" from prospective stockholders and these were supplied to Wood before or after August 27. It was also impossible to make any sales to so-called "fence-riders."

The plaintiff's contract bound the Wood Company to use its best efforts for a period of ninety days following final clearance by the State and Federal regulatory agencies. The SEC issued its so-called "no comment" letter on August 22, 1962, to be effective on August 27, 1962. When the defendant's buy-out of the Wood Company went into effect on October 15, 1962, it was thereafter impossible for the Wood Company to exert any effort in the plaintiff's behalf. The Wood Company's personnel were then under the control of the defendant, and by October 22, 1962, the Wood Company's salesmen had had their licenses transferred to the defendant, leaving them unable to further sell as agents for the Wood Company. Up until October 15, 1962, the Wood Company had not made a single independent sale of the plaintiff's stock. The plaintiff has elicited testimony that at this time the Dow-Jones averages were moving up again and hit a "high" at about the end of the year. The apparent inference that the plaintiff wishes to have drawn from this testimony is either that the defendant should have allowed its St. Paul office to continue to endeavor to sell the plaintiff's stock, as reasonable securities dealers could have foreseen that market conditions were going to get better, or that the defendant should have held up its "buy-out" of the Wood Company for the full ninety days, affording maximum protection to the plaintiff's interest in having its contractual expectations fulfilled. The defendant has put on considerable evidence to the effect that neither the Wood Company (assuming its salesmen had remained licensed to sell for it) nor any other broker or dealer would or could have sold any of the plaintiff's stock. In short, there seems to be a controversy as to what view reasonable securities dealers might take of the local stock market, looking at it as of October 15, 1962. The plaintiff's case is posited on the theory that the defendant's buy-out of the Wood Company was unjustified; the defendant's evidence tends to contradict this, though the defendant argues that it does not have to show any justification.

■■ Recovery may be had in Minnesota for inducing breach of contract

by establishing: (1) the existence of a contract, (2) the alleged wrongdoer's knowledge of the contract, (3) his intentional procurement of its breach (4) without justification and (5) damages resulting therefrom. Snowden v. Sorensen, 246 Minn. 526, 75 N.W.2d 795, 799 (1956). Recovery may also be had for interference with contract, "[which] is somewhat broader than 'inducing breach of contract' in that the former includes ' "any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee." ' " Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667, 671 (1955).

The defendant has introduced considerable evidence that there is no industry standard as to what a dealer's best efforts are supposed to be, apparently in support of the idea that the plaintiff's contract with the Wood Company was void because of vagueness as to the terms and therefore was not an "existing contract" within the meaning of the definition in the Snowden case, supra. It is true that the contract was not extremely favorable to the plaintiff, but it was a legally binding contract during the period from August 27, 1962, to November 24, 1962.

▮ The defendant further argues with considerable force that it did not know of the plaintiff's contract as of September 29, 1962, the date of the defendant's offer to the Wood Company, or, if it did know of the contract's existence, it did not know that the contract had not been performed, citing Sweeney v. Smith, 167 F. 385 (E.D.Pa.1909), aff'd. 171 F. 645 (3rd Cir.) and cited with approval in Snowden v. Sorensen, 246 Minn. 526, 75 N.W.2d 795 (1956) and Minnesota Wheat Growers' Co-op. Marketing Ass'n v. Radke, 163 Minn. 403, 204 N.W. 314 (1925). It is true that the plaintiff's corporate counsel exerted all of his efforts to persuade the defendant to take on the plaintiff's issue *after* the date of the defendant's offer to purchase the Wood Company's assets. There is no direct evidence that the defendant knew of the plaintiff's contract before September 29, 1962, but there is sufficient circumstantial evidence upon which to base an inference that the defendant's management did know of the plaintiff's contract and that it had not been performed by the Wood Company. Leo Quist wrote to Ned Owens on October 5, 1962, and informed him of the forthcoming consolidation with the defendant on the 15th of the month. He said that:

" * * * When these negotiations were going on, we discussed with them the CONTINENTAL RESEARCH offering. Mr. Podesta, the managing partner, suggested that if they could qualify this issue in the State of Illinois they would carry the ball for you.

"I received a letter from Bob yesterday advising that unfortunately CONTINENTAL RESEARCH simply would not qualify in the State of Illinois; * * * "

At the trial Mr. Podesta also mentioned that such proposed issues as the plaintiff's were run through the routine channels of their office, that he had seen the plaintiff's offering circular and that he "assumed" that the plaintiff's offering circular had been given the routine treatment in their office. When Podesta testified at the trial, his general manner reflected an assumption that he knew about the plaintiff's issue when he decided to buy the Wood Company's assets and hire its salesmen but that, as previously described, he did not feel legally obligated to assume the plaintiff's issue even on a best efforts basis and that he did not wish to do so. The defendant's awareness of the plaintiff's contract prior to September 29, 1962, was not as extensive as it was after the plaintiff's corporate counsel began to urge the defendant to help the plaintiff get its stock sold, but it was sufficient.. As the Minnesota Court has said, Swaney v. Crawley, 154 Minn. 263, 191 N.W. 583, 584 (1923):

"The rule is that such knowledge is an essential element of a cause of action based on defendant's willful

interference with plaintiff's contractual relations with a third person. Twitchell v. Glenwood-Inglewood Co., 131 Minn. 375, 155 N.W. 621; 7 Minn.Law Rev. 69. It is not necessary to prove actual knowledge. It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties."

There is some question whether the Twitchell case is still law [1] but the proof adduced by the plaintiff here goes far beyond this requirement.

 It does not follow, however, that merely because the defendant knew of the plaintiff's contract when it entered into the contract with the Wood Company that it thereby intentionally *induced* the Wood Company to breach its contract with the plaintiff. Compare Sweeney v. Smith, 167 F. 385 (E.D.Pa.1909), aff'd. 171 F. 645 (3rd Cir.). The evidence here conclusively shows that although Mr. Podesta did offer to negotiate with Mr. Quist on November 10, 1961, Mr. Quist went to Chicago in August of 1962 to first open serious negotiations on his own initiative and because of the fact that the Wood Company was losing money at an alarming rate. Mr. Podesta responded to Mr. Quist's preliminary offer with his firm offer of September 29, 1962. It is therefore impossible to find that the defendant intentionally procured the breach of the plaintiff's contract with the Wood Company, considering that Mr. Quist went to Mr. Podesta in August of 1962—and not vice versa. Compare Sorensen v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35 (1927). There can be little doubt, however, that the defendant has interfered with the plaintiff's contractual relations. The

Wood Company could not continue to try to sell the plaintiff's stock for the balance of the ninety days without salesmen, and the defendant, with sufficient knowledge of this state of facts, hired the Wood Company's salesmen and thereby made performance of the plaintiff's contract impossible. It is also doubtful whether the Wood Company would have been able to function well without its assets, which included its office lease, the desks and chairs, and other such equipment. The case is thus somewhat similar to Twitchell v. Glenwood-Inglewood Co., 131 Minn. 375, 155 N.W. 621 (1923). In that case the plaintiff had established a business of selling spring water from a well upon her land. She then transferred the business and its necessary paraphernalia to Anderson and Nelson, who agreed to carry on the business for ten years and pay the plaintiff $100 per month as rent. They also agreed not to dispose of the business without the written consent of the plaintiff. The two men were bothered by one Cummings, who set up a totally unfounded claim to their well. Cummings purchased the interest of Anderson, who sold it to one Nimmerfroh, who subsequently sold it to the defendant Glenwood-Inglewood Co., a corporation engaged in the same line of business. Nelson then sold out to the Glenwood-Inglewood Co., and as a part of the transaction entered its employ as a salesman, solicited the plaintiff's old customers and was successful in winning them over to the Glenwood-Inglewood Co. The business leased by the plaintiff to Nelson and Anderson was abandoned and the plaintiff's contract was thus "broken and violated." Damages against the defendants Cummings and Glenwood-Inglewood Co. for wrongful interference with the contractual relations of the plaintiff were sustained. There, as here, the performance

---

1. The Twitchell case has been cited as holding the defendant corporation liable in tort for negligent interference with contractual relations. Carpenter, Interference With Contractual Relations, 41 Harv.L.Rev. 728, 740, at fn. 52 (1928). Language in Snowden v. Sorensen, 246 Minn. 526, 75 N.W.2d 795 (1956) gives rise to doubt whether the Minnesota Court would now impose tort liability upon one who was negligent in not finding out about a contract between two other parties.

of the contract was made impossible by virtue of a third party buying the assets and hiring the personnel of the obligor, the assets and the personnel being the means by which the contract obligee was to receive her contractual performance. A similar case is Swaney v. Crawley, 133 Minn. 57, 157 N.W. 910 (1916), in which the defendant prevented the performance of a contract to sell land by persuading the owner by false statements to sell the land to the defendant rather than to the contract vendee. Liability was imposed because of the "wrongful and malicious interference" with the contract relations between the vendor and vendee, citing Twitchell v. Glenwood-Inglewood Co., supra.

There is no question here that the plaintiff has suffered an invasion of its interest in having its contract relations unimpaired by the intentional acts of third parties; the question is whether the defendant's acts were "wrongful" under Minnesota law. Swaney v. Crawley, supra. It thus is necessary to attempt to ascertain the precise elements and boundaries of the tort of interference with contract relations.[2] For pur-

poses of this case, it seems most feasible to examine the Minnesota cases from the standpoint of the motives of the persons sought to be charged. This is somewhat difficult because a number of the cases involve complaints which were tested by demurrer. Further, the word "malice" might have occasionally been used to mean different things in different cases.[3]

The first group of cases involves situations in which the defendant or defendants have acted with the single purpose of injurying the plaintiff, with ill will being present occasionally. Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.,N.S., 599 (1909), is the most prominent case in this category. In that case the trial court overruled a demurrer to a complaint which alleged that the plaintiff operated a barbershop, that the defendant had been trying to destroy the plaintiff's business, that, among other things, the defendant had fitted up a rival barber shop for the "sole and only purpose of injuring the trade of the plaintiff" and "not for the purpose of serving any legitimate interest of his own." In a holding which had been ably prophesied only four years before,[4] the Court affirm-

---

2. " * * * [J]ustice is too easily lost through too sweeping generalization; the law, at the outset often misled by easy generalization, achieves justice only by the subsequent slow and critical process of the 'taking of differences.' " Sayre, Inducing Breach of Contract, 36 Harv.L. Rev. 663, 667 (1923).

3. Dean Ames has complained of this in his article, How Far an Act May be a Tort Because of the Wrongful Motive of the Actor, 18 Harv.L.Rev. 411, 422 (1905):
 "Malice, as used in the books, means sometimes malevolence, sometimes absence of excuse, and sometimes absence of a motive for the public good. If so 'slippery' a word, to borrow Lord Bowen's adjective, were eliminated from legal arguments and opinions, only good would result."
 Justice Stone, dissenting in Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, at 756–757, 84 A.L.R. 35 (1927), also took issue with broad use of the word:
 "It is easy to say that 'wrongful interference' with the contract rights of an-

other resulting in his damage is an actionable wrong. That is undoubted law, except in those jurisdictions which have refused to apply the rule of Lumley v. Gye, 2 El. & Bl. 216, 75 E.C.L. 244. The difficulty arises in determining what makes a case of 'wrongful interference,' and is enhanced by considering malice an element instead of merely a frequent attendant of the offense. The word in the present connection is 'a mere title' and 'its use always occasions question and require definition and explanation. * * * "When all that is meant by malice is an intention to commit an unlawful act without reference to spite or ill feeling, it is better to drop the word * * * and so avoid all misunderstanding." ' [Citing] R and W Hat Shop v. Sculley, 98 Conn. 1, 118 A. 55, 29 A.L.R. 551" (1922).

4. "To divert to one's self the customers of a rival tradesman by the offer of goods at lower prices is, in general, a legitimate mode of serving one's own interest and justifiable as fair competition. If, however, a man should start an opposition shop, not for the sake of profit for him-

ed, holding that the liability of the defendant turned on the motive with which he had acted.

"To divert to one's self the customers of a business rival by the offer of goods at lower prices is in general a legitimate mode of serving one's own interest, and justifiable as fair competition. But when a man starts an opposition place of business, not for the sake of profit to himself, but regardless of loss to himself, and for the sole purpose of driving his competitor out of business, and with the intention of himself retiring upon the accomplishment of his malevolent purpose, he is guilty of a wanton wrong and an actionable tort. In such a case he would not be exercising his legal right, or doing an act which can be judged separately from the motive which actuated him. To call such conduct competition is a perversion of terms. It is simply the application of force without legal justification, which in its moral quality may be no better than highway robbery."

A similar case is Faunce v. Searles, 122 Minn. 343, 142 N.W. 816 (1913), in which the defendants induced a school board to breach a written contract with the plaintiff, who had been employed by the school board as superintendent of the city schools. One defendant was a member of the school board and the other was a resident of the school district. In affirming a verdict for damages for "malicious interference" the Court said that the evidence justified a finding by the jury that the defendants "were actuated by malice," apparently meaning ill will and a desire to injure. As to the matter of possible justification, the Court said, "The jury might have concluded, but did not, that the defendants were working in the interests of the schools,

and bore [him] no malice." The Court also noted that the trial court might have instructed the jury "relative to the good faith of the defendants" and the effect which they might give to the fact that both defendants had a legitimate interest in the welfare of the school and the problems it had been having. Another case of like import is Heffernan v. Whittlsey, 126 Minn. 163, 148 N.W. 63 (1914). In that case the plaintiff was employed as a railroad ticket seller. Whittlsey had been station agent at the same town for a number of years and the plaintiff had worked under him. Whittlsey was retired because of a controversy between him and the plaintiff over telegram commissions, in which the plaintiff was sustained. Whittlsey caused the plaintiff to be investigated because of an irregularity in ticket sales, and the plaintiff was subsequently fired. The plaintiff sued Whittlsey and the railroad for maliciously conspiring to cause the plaintiff to be investigated and wrongfully discharged from his position. The plaintiff got a verdict against both defendants. The Court reversed the judgment against the railroad, saying that there was "no evidence whatever of bad motives or malice" on the railroad's part and "that there is no liability in the absence of malice cannot be doubted." The verdict against Whittlsey was sustained, the evidence being "sufficient to justify a finding that the charges made against plaintiff were false, and that he acted out of motives of ill will, and with a desire to injure plaintiff." 148 N.W. at 65. The opposite side of the issues in Faunce v. Searles and Heffernan v. Whittlsey is seen in Wolfson v. Northern States Management Co., 210 Minn. 504, 299 N.W. 676 (1941), where it was held that the defendants were justified in causing the plaintiff to lose his job because he was derelict in the performance

---

self, but, regardless of loss to himself, for the sole purpose of driving the plaintiff out of business and with the intention of retiring himself immediately upon the accomplishment of his malevolent purpose, would not this wanton causing of damage to another be altogether indefensible and a tort? Such a case is not likely to arise, but several judges have expressed the opinion that the defendant in such a case would have to make reparation." Ames, supra, note 3, at 420. See also Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 3 (1894).

of his duties, because he gave his own interests preference in the distribution of his efforts, and because he permitted the dissipation of corporate funds by an employee. Cases similar in principle are Virtue v. Creamery Package Mfg. Co., 123 Minn. 17, 142 N.W. 930, L.R.A. 1915B, 1179 (1913) ("good faith" determinative of liability) and Dewey v. Kaplan, 200 Minn. 289, 274 N.W. 161 (1937) (complaint dismissed for lack of allegation of purpose to destroy plaintiff's business).

A second category of cases involves inducement of breach or interference with contract by one who sought to benefit himself at the expense of the plaintiff. In Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W.2d 754 (1954), the plaintiff had an exclusive agency contract with the Chevrolet Motor Co. The defendant Sander, a competitor of the plaintiff, intentionally procured the breach of this agency contract to get the agency contract for himself. The plaintiff's complaint alleged that the defendant's purpose was to destroy the plaintiff's business and appropriate it to himself. The Court's opinion contains language indicating that the first motive imposed the liability and the second only accentuated the "inherent wrongfulness" of the defendant Sander's conduct, but discussion of Sorenson in Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252 (1938), indicates that the element of appropriation to the defendant of contract rights and benefits which the plaintiff had secured to himself by contract is a sufficient basis for tort liability without the presence of a purpose to injure the plaintiff. In the Johnson case the plaintiff was a real estate broker who showed the defendant Clarity some property he wished to buy, although Clarity did not wish to pay the plaintiff's commission. As the plaintiff's listing contract was not an exclusive one, the defendant Clarity had the defendant Gustafson go to the owner, buy the property without telling the owner of his relationship with Clarity, and then convey the property to Clarity. Although the Court's holding that the defendants were liable to the plaintiff for wrongful interference with his contractual rights has been questioned on theoretical grounds,[5] the case is nevertheless significant here for the rationale it announced. Although the Court said that it was not a justification for interference that the defendants were *acting to further their own interests*, citing Sorenson v. Chevrolet Motor Co., the Court's quotation of language from a New Jersey case seems to illustrate what the Court deemed to be the precise rationale of that case and perhaps the Sorenson case as well, 277 N.W. at 255:

" 'Merely to persuade a person to break his contract, may not be wrongful in law or fact. * * * But if the persuasion be used for the *indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act,* which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it.' " (Emphasis by Minnesota Court.)

If the above motives are not present, then it *might* follow that there is no liability for persuading one to breach his contract with another, and it should certainly follow that there is no liability for

5. In Oppenheim, Unfair Trade Practices 1289 (1950), it is said:
Johnson v. Gustafson, supra, and other cases herein cited, involved issues regarding the prevention of the consummation of a transaction in which there is negotiation for the sale of real estate through the intermediation of a broker in an isolated instance. Such fact situations should be distinguished from instances of interference with established business custom. Questions arise whether a recovery should be allowed and, if so, whether liability should be based upon an extension of Lumley v. Gye, or upon the general principle of an unjustified interference with prospective economic advantages. A group of such cases are classified and analyzed in (1938) 37 Mich. L.Rev. at 122–124.

mere interference which causes a breach of contract.

A number of the Minnesota cases are in harmony with the above quoted language from the Johnson case. In Mealey v. Bemidji Lumber Co., 118 Minn. 427, 136 N.W. 1090 (1912), the plaintiff had made a contract with one Ashcraft to cut certain timber and haul out the logs by April 1, 1908. In January and March of that year the defendant persuaded Ashcraft's employees to quit work for the purpose of preventing the logs from being hauled out. The reason for the defendant's interference with the work was that he had contracted to buy the logs from the plaintiff in the fall and the price of logs fell sharply soon after the contract had been entered into. The defendant thus stood to gain at the plaintiff's expense by interfering with the performance of Ashcraft's contract with the plaintiff. In Canellos v. Zotalis, 145 Minn. 292, 177 N.W. 133 (1920), the plaintiff alleged that the defendant, a business competitor, had "maliciously" caused him to be evicted from the building he occupied for the purpose of destroying his business. The plaintiff further alleged that the defendant had slandered him. The Supreme Court held that there was no misjoinder of causes of action as each allegation stated a single cause of action. It has not been necessary for the defendant to be in direct business competition with the plaintiff in order to be held liable for interfering with the plaintiff's contractual relations. In the Sorenson and Canellos cases, supra, the defendant was a competitor of the plaintiff, and the same was true of the defendant corporation in Twitchell v. Glenwood-Inglewood Co., 131 Minn. 375, 155 N.W. 621 (1915). Other schemes to defraud brokers of their fees did not involve direct competitors. Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667 (1955); Spring Co. v. Holle,

248 Minn. 51, 78 N.W.2d 315 (1956). But all of these cases seem explicable by the rationale spelled out in Johnson v. Gustafson, supra, a case cited as a definitive precedent in Jensen v. Lundorff, 258 Minn. 275, 103 N.W.2d 887, 890 (1960), and one in which the defendant stood to benefit at the expense of the plaintiff by his interference. The principle implicit in the real estate agent cases was extended to impose liability in American Surety Co. v. Schottenbauer, 257 F.2d 6 (8th Cir., 1958), a diversity case involving Minnesota law.

It is not enough, however, to say here that the defendant was acting in furtherance of its own interest in freedom to enter contractual relations and with motives unlike those proscribed in the two categories above mentioned. There are other cases in which motives were disregarded and the cases decided on other grounds. These cases all involve concerted action or what might be loosely termed a boycott. The first case in this category is the leading case in Minnesota involving interference with contract. Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N.W. 1119, 21 L.R.A. 337 (1893). In that case the defendants, retail lumber dealers, had agreed to boycott or refuse to deal with lumber manufacturers who sold directly to retail consumers, unless the manufacturer was willing to pay the association a fine of 10% on such sales. The association had no desire to injure manufacturers in their business unless the latter did not comply with the former's wishes. One such manufacturer who did not pay his 10% fine sued to prevent a boycott by the association, alleging a potential loss of profits. The plaintiff did not prevail. Justice Mitchell, after ably foretelling that the issue presented would be one of the courts' most difficult questions for the next twenty-five years,[6] pointed out that the members of the asso-

---

6. "The case presents one phase of a subject which is likely to be one of the most important and difficult which will confront the courts during the next quarter of a century. This is the age of associations and unions, in all departments of labor and business, for purposes of mutual benefit and protection. Confined to proper limits, both as to end and means, they are not only lawful, but laudable. Carried beyond those limits, they are liable to become dangerous agencies for wrong and oppression. Beyond what limits these associations or combinations cannot go,

ciation were acting in their own interests and that the plaintiff manufacturer had his choice whether he chose to comply with the association's wishes or not. It was observed that associations may be entered into which may tend to diminish the gains and profits of another, and yet, so far from being unlawful, they may be highly meritorious, citing Steamship Co. v. McGregor, 23 Q.B.D. 598 (1889), aff'd [1892] A.C. 25. "What one man may lawfully do singly, two or more may lawfully agree to do jointly." 55 N.W. at 1121. The explicit rationale [7] of Bohn Mfg. Co. v. Hollis was then relied upon by the defendants in Ertz v. Produce Exchange Co., 79 Minn. 140, 81 N.W. 737, 48 L.R.A. 90 (1900), who were dealers in farm produce who controlled the market in Minneapolis and who had allegedly boycotted the plaintiff, one of their competitors, for the sole purpose of injuring his business. The defendants demurred to the complaint, giving no reason for their motion. The defendants argued on appeal that the intent with which they had acted was immaterial. The Court affirmed the trial court's overruling of the demurrer, distinguished Bohn Mfg. Co. v. Hollis, and reasoned that:

> * * * [O]ne man singly, nor any number of men jointly, having no legitimate interests to protect, may not lawfully ruin the business of an-

other by maliciously inducing his patrons and third parties not to deal with him. See Walker v. Cronin, 107 Mass. 555, 562; * * *.

In Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. 663, 63 L.R.A. 753 (1903), the plaintiff sued to enjoin the defendants, delegates from various labor unions to the Minneapolis Building Trades Council, from exerting what is now called a secondary boycott on the plaintiff. The defendants went to one of the plaintiff's customers and told the customer that it would get labor trouble if it continued to deal with the plaintiff. The defendants wished the plaintiff to hire union labor. The plaintiff argued that he would lose profits by the defendants' boycott. The defendants argued that their efforts to unionize the plaintiff were legitimate, were resorted to for the purpose of furthering the interests of the unions and "without malicious intent to injure the business of plaintiff," and that if injury in fact resulted to the plaintiff, it was incidental to the exercise of a lawful right by the defendants. Here, as in Bohn Mfg. Co. v. Hollis, the plaintiffs could have stopped the boycott by complying with the defendants' wishes. The Court held for the plaintiffs, saying that a strike was legal, citing the Bohn Mfg. Co. case, but that a boycott was an unlawful conspiracy,[8] citing, inter alia,

without interfering with the legal rights of others, is the problem which, in various phases, the courts will doubtless be frequently called to pass upon. There is, perhaps, danger that, influenced by such terms of illusive meaning as 'monopolies,' 'trust,' 'boycotts,' 'strikes,' and the like, they may be led to transcend the limits of their jurisdiction, and, like the court of king's bench in Bagg's Case, 11 Coke, 98a, assume that, on general principles, they have authority to correct or reform everything which they may deem wrong, or, as Lord Ellsmere puts it, 'to manage the estate.'" Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N.W. 1119, 21 L.R.A. 337 (1893) (per Mitchell, J.).

7. "It is perfectly lawful for any man (unless under contract obligation, or unless his employment charges him with some public duty) to refuse to work for or to deal with any man or class of men,

as he sees fit. This doctrine is founded upon the fundamental right of every man to conduct his own business in his own way, subject only to the condition that he does not interfere with the legal rights of others. And, as has been already said, the right which one man may exercise singly, many, after consultation, may agree to exercise jointly, and make simultaneous declaration of their choice. This has been repeatedly held as to associations or unions of workmen, and associations of men in other occupations or lines of business must be governed by the same principles." Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 234–235, 55 N.W. 1119, 1121–1122, 21 L.R.A. 337 (1893).

8. "Labor may organize, as capital does, for its own protection and to further the interests of the laboring class. They may strike, and persuade and induce others to join them, but when they resort to un-

Vegelahn v. Guntner, 167 Mass. 92, 97, 44 N.E. 1077, 35 L.R.A. 722 (1896); In re Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; and Temperton v. Russell, [1893] 1 Q.B. 715. The Court noted that the authorities restrained boycotts because they were "unlawful interferences with property rights," adding that the Minnesota Constitution guaranteed a remedy for wrongs to all fundamental rights. The Court did modify the trial court's injunction against the defendants insofar as it restrained them from notifying the plaintiffs' customers that the plaintiffs were unfair (meaning that they did not hire union labor). The next case was Joyce v. Great Northern Ry., 100 Minn. 225, 110 N.W. 975, 8 L.R.A.,N.S., 756 (1907), where the plaintiff, a former employee of the St. Paul Union Depot Co., sued the defendant railroad company for preventing the plaintiff from regaining his employment with the St. Paul Union Depot Co. unless the plaintiff would sign a release for injuries caused by the defendant's train while in the depot company's employ. The depot company would have been glad to rehire the plaintiff if he simply signed the release. There was a business relationship between the defendant and the depot company, which enabled the defendant to interfere with the plaintiff's contractual relations in this way. The trial court dismissed the complaint on the theory that the defendant had a sufficient interest in the men employed by the depot company in and about the yards to justify such a demand. Basing its decision partly on a statute, the Court reversed the case for a new trial, also citing the boycott cases and Lumley v. Gye, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853). The Court reasoned that the statute, reprinted in the margin,[9] required a showing of malice, noting that other courts had read the defense of good faith into the statute. Clarifying the meaning of the word "malice," [10] the Court then held that the statute meant that a person had the right to take action in behalf of his own interests so long as he did not intentionally cause harm to another without justification, but that the furtherance of such interests could not be justified by interference for the purpose of depriving the plaintiff of his rights in tort against the defendant, assuming that the plaintiff's claim had reasonable merit. In Scott-Stafford Opera House Co. v. Minneapolis Musicians' Ass'n., 118 Minn. 410, 136 N.W. 1092 (1912), theatre owners sued to enjoin enforcement of a rule of the defendant musicians union which would forbid the members of the union to work for any of the plaintiffs unless a certain number of persons, all union men, were included in the orchestra. A demurrer to the complaint was sustained,

lawful means to cause injury to others with whom they have no relation, contractual or otherwise, the limit permitted by the law is passed, and they may be restrained." Gray v. Building Trades Council, 91 Minn. 171, 182–183, 97 N.W. 663, 667, 63 L.R.A. 753 (1903). Compare this language with the admonition of Justice Mitchell is foonote 6, supra.

9. "It shall be unlawful for any two or more employers or any two or more corporations, to combine or agree to combine or confer together for the purpose of interfering with or preventing any person or persons from procuring employment, either by threats, promises, or by circulating or causing to be circulated black lists, or for the purpose of procuring and causing the discharge of any employé or employés by any means whatsoever." Section 5097, Revised Laws of 1905.

10. "A person may take such action in furtherance of his own interests, in the preservation and protection of his property rights, as circumstances may require, and so long as he does not act maliciously toward, or unreasonably or unnecessarily interfere with the rights of his neighbor, he cannot be charged with actionable wrong, whatever may be the result of his conduct in pursuing his own welfare. Malice is therefore essential to the right of action under the statute; not express malice, but such as the law implies in such cases from the fact that the act complained of was unlawful. Malice, under the common acceptation of the term, means ill will against a person; but in its legal sense, as applied to statutes like this, it means an unlawful act, done intentionally without just cause or excuse." Joyce v. Great Northern Ry., 100 Minn. 225, 233, 110 N.W. 975, 978, 8 L.R.A., N.S., 756 (1907).

the Court stating that Bohn Mfg. Co. v. Hollis was in point [11] and that Ertz v. Produce Exchange Co. and Tuttle v. Buck were not. The plaintiffs argued that the defendant's rule was not beneficial to the members of the union, but the Court replied that the rule was not so non-adapted to produce benefit "as to raise an inference of malice or evil motive;" that the defendants in the Bohn case had had similar legitimate interests to protect, and that there had been no secondary boycott. In Grant Const. Co. v. St. Paul Bldg. Trades Council, 136 Minn. 167, 161 N.W. 520 (1917) and Steffes v. Motion Picture Mach. Operators' Union, 136 Minn. 200, 161 N.W. 524 (1917) the Court allowed peaceful picketing by labor unions in an attempt to force an employer to hire only union labor, but in Rorabach v. Motion Picture Mach. Operators' Union, 140 Minn. 481, 168 N.W. 766, 169 N.W. 529, 3 A.L.R. 1290 (1918), the Court would not allow picketing of a theatre for the purpose of persuading the owner to hire union labor and stop operating the machines himself. Citing Tuttle v. Buck and Ertz v. Produce Exchange Co. and distinguishing Steffes v. Motion Picture Mach. Operators' Union, supra, the Court said:

"Defendants may use any lawful means to accomplish a lawful purpose, although the means adopted may incidentally cause injury to plaintiff; but they may not intentionally injure or destroy plaintiff's business to accomplish an unlawful purpose."

Phrasing the question as being "whether the owner shall be permitted to work himself in his own business," the Court said that the right of every person to work in his own business was guaranteed to him by the Bill of Rights and the Fourteenth Amendment to the Federal constitution.

"If the facts bear out plaintiff's claim that the purpose of defendants is

to compel him to cease working as an operator in his own business, it will follow that they are seeking to accomplish an unlawful purpose, and that the acts by which they are attempting to prevent the public from patronizing him will fall within the class of acts which the law deems malicious, and which it is the duty of the courts to restrain." Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, Ann.Cas.1918B, 461 (1917).

The last two boycott cases are Bacon v. St. Paul Union Stockyards, 161 Minn. 522, 201 N.W. 326 (1924) and Carnes v. St. Paul Union Stockyards, 164 Minn. 457, 205 N.W. 630, 206 N.W. 396 (1925). In the Bacon case the plaintiff alleged that the defendant forbade any firm using its stockyards from hiring him, as one such firm had formerly done. The trial court sustained a demurrer to the complaint but the Court reversed, saying:

"The wrongful interference with the contract relations of others causing à breach is a tort. We are of the opinion that the complaint states a cause of action for wrongful interference with plaintiff's employment. It appears from the complaint that the plaintiff had steady employment, and that defendant wrongfully, willfully, and unlawfully prevented him from continuing in that employment. We think such conduct is in violation of plaintiff's rights. * * * The defendant may have reasons to justify its conduct, but such reasons do not appear in the complaint."

The Carnes case was a similar case of exclusion from the defendant's yards. The defendant refused to deal with any commission firm who hired the plaintiff as a salesman. After adverting to the general rule and explaining the meaning of the word malice,[12] the Court turned to the matter of justification. The evidence

---

11. The Court relied on the language appearing in footnote 7, supra.

12. "The term 'malice,' as used in the class of cases mentioned, means nothing more than the intentional doing of a wrongful

act without legal justification or excuse, or, otherwise stated, the willful violation of a known right. Whether a wrongdoer's motive in interfering is to benefit himself, or to gratify his spite by working mischief to another, is immaterial;

was not fully developed at the trial, as the defendant had been granted a dismissal of the case after the plaintiff had rested. The defendant had pleaded that it had learned after admitting the plaintiff to its yard that the plaintiff had been guilty of business irregularities and had been suspended by the Live Stock Exchange for misconduct in business transactions. The defendant argued that the plaintiff was a mere licensee and that the defendant could protect its interests by excluding the plaintiff for any cause it deemed sufficient. The Court felt this argument was impaired by the fact that the defendant was a public stockyard, that the plaintiff had been duly admitted, and that the firm which had offered the plaintiff employment was also admitted. The Court, however, did feel that the defendant had valid interests to protect, that there could be justification for such an exclusion, and that because of this interest it had a wide liberty of action and "a discretion of management not lightly to be interfered with by the judiciary." [13]

It will be observed that some of the foregoing cases fit into the two categories of cases previously mentioned and some do not. The Ertz, Bacon and Carnes cases seem explicable under the rationale of Tuttle v. Buck that it is tortious to take action for the sole purpose of harming another without justification or excuse. Joyce v. Great Northern Ry. seems explicable under the rationale of Johnson v. Gustafson—that it is tortious to interfere with contractual relations for the benefit of the defendant and at the expense of the plaintiff. Other cases, however, are difficult to reconcile. The refusal to deal in the Bohn Mfg. Co. case was no less harmful to the plaintiff than the refusal to deal in Rorabach v. Motion Pictures Mach. Operators' Union, and an injunction was authorized against the defendants in the latter case and not in the former. The Court in Rorabach v. Motion Pictures Mach. Operators' Union held that the purpose sought by the defendants was an unlawful one, but the plaintiff there had the same choice that the plaintiff in Bohn Mfg. Co. had—he could act in the manner that suited him best (and face pressure from the defendants) or he could yield to the will of the defendants and alleviate the pressure upon him. If the plaintiff in Rorabach had been compelled to hire more workers than he needed, this was no more than the plaintiff had to do in Scott-Stafford Opera House Company v. Minneapolis Musicians Ass'n., where the Court held that it was permissible for the union to strike for the purpose of achieving maximum employment of its members. In both Gray v. Building Trades Council and

malice in the sense of ill will or spite not being essential. Numerous cases thus defining malice are collected in 15 R.C.L. pp. 56 and 57." Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 462, 205 N.W. 630, 631–632, 206 N.W. 396 (1925).

13. "[D]efendant has lawful interests to protect, and may properly refuse to admit to its yards a commission man, or one of his employees, if there is justification or valid excuse for the refusal. As was said in the Joyce Case, defendant might insist that no unworthy persons should be employed upon its property, and, if that was the basis of its action, no liability exists. In other words, defendant is not merely an officious intermeddler in plaintiff's affairs, with no legitimate interest to serve. Such an intermeddler can rarely, if ever, justify or excuse his conduct. But one standing in the position of defendant has rights which it may assert by excluding from its property a man of doubtful reputation, or one who had been guilty of misconduct in his dealings with defendant's patrons."

"What would justify exclusion we do not now attempt to decide. We do say, however, that, because defendant had a legitimate interest to protect, in that it is the owner of the stockyards and responsible for their efficient management and proper use, particularly by local market agencies, it has liberty of action much wider than that of a third party having no such interest or duty, in the premises, and a discretion of management not lightly to be interfered with by the judiciary, who have none of the regulatory and administrative power, legislative in origin, which has been assigned by Congress to the Secretary of Agriculture." Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 464–465, 205 N.W. 630, 632, 206 N.W. 396 (1925).

Bohn Mfg. Co. v. Hollis, the defendants acted with what might be called a limited desire to harm—a desire to harm only if the adverse party did not yield to the defendants' wishes. In both cases, the harm complained of was incidental to action taken in furtherance of the actor's own interests but the defendants were enjoined in Gray and not in Bohn Mfg. Co. The distinction in the two cases is quite relevant in the instant case for the defendant here is charged with wrongful interference with the plaintiff's contractual relations because of harm incidental to the furtherance of its own interests, which was essentially the harm to the plaintiff in Gray v. Building Trades Council. It seems doubtful that the distinction lies in the fact that the boycott was secondary rather than primary for the same type of pressure which was condemned in Gray v. Building Trades Council was given tentative approval in Carnes v. St. Paul Union Stockyards Co. If the Minnesota cases are conflicting, however, the Court was simply following the early English and Massachusetts cases.

The first of the English cases germane here is Keeble v. Hickeringill, 11 East 574, n., 103 Eng.Rep. 1127 (1707), which was an action on the case for discharging guns near the decoy pond of another "with design to damnify the owner by frightening away the wildfowl resorting thereto." Lord Holt held that the action would lie, and two hpotheticals which he mentioned seem to illustrate the distinction in conduct which could form the basis for recovery in tort and conduct which has not. Lord Holt said, "Suppose the defendant had shot in his own ground; if he had occasion to shoot, it would have been one thing; but to shoot on purpose to damage the plaintiff is another thing, and a wrong." These words suggest that Lord Holt thought that liability for an act would turn on the motive or purpose for which it was done. An-

other analogy by Lord Holt is to the same effect, 11 East at 576:

> "One schoolmaster sets up a new school to the damage of an antient school, and therebye the scholars are allured from the old school to come to his new. (The action was held not to lie.) But suppose Mr. Hickeringill should lie in the way with his guns, and fright the boys from going to school, and their parents would not let them go thither; sure that schoolmaster might have an action for the loss of his scholars."

See also Carrington v. Taylor, 11 East 570, 103 Eng.Rep. 1126 (1809). It will be observed that Keeble v. Hickeringill, supra, which has been described by Dean Prosser as the first case where "motive was first held to be sufficient in itself to determine liability," Prosser on Torts (1941), is the same sort of case as Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.,N.S., 599 (1909). The "design to damnify" in the Keeble case and the "malevolent purpose" in Tuttle v. Buck turned otherwise lawful acts into conduct which could form the basis for a civil action. It will be further observed that Lord Holt's notions as to lawful and unlawful conduct have been strictly adhered to in Minnesota in the first category of cases previously mentioned. A fairly clear line is drawn in the cases between "officious intermeddling" [14] and justifiable injury to contractual relations. See, e. g., Faunce v. Searles, 122 Minn. 343, 142 N.W. 816 (1913).

The second category of cases typified by Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35 (1927), had its modern origin [15] in the famous case of Lumley v. Gye, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853), where it was held to be actionable to "maliciously" procure a singer to refuse to carry out her agreement to perform in the plaintiff's theatre. This was something of a

14. See footnote 13, supra.

15. An excellent discussion of the effect upon the law of earlier cases in the Year Books and the Statute of labourers in 1350 is found in Sayre, Inducing Breach of Contract, 36 Harv.L.Rev. 663 (1923).

departure from the previous interpretations [16] of the Statute of Labourers and the correctness of the principle announced was in some doubt [17] until the case of Bowen v. Hall, 6 Q.B.D. 333 (1881). In that case A had induced B to make glazed bricks for A and no one else for five years. The process by which B made the glazed bricks was a trade secret known only to B and a few others. C, a competitor of A's, induced B to break his exclusive contract with A and make bricks for C. A sued C, citing Walker v. Cronin, 107 Mass. 555, and the Court reaffirmed Lumley v. Gye, indicating why it thought C's conduct was "malicious." [18] Lord Coleridge dissented from the idea that liability could turn solely on the motive with which a person acted.[19] It will be observed that the Court's rationale, reprinted in the margin,[20] is similar to the language (with certain omissions) which appears in Johnson v. Gustafson, supra, 277 N.W. at 255, and is attributed there to the New Jersey Court. The fact situation in Bowen v. Hall is very similar to that in Sorenson v. Chevrolet Motor Co. in that in both cases the defendant was held liable for procuring for himself the existing advantages which another had secured by contract. This fact situation is not that which appears in Johnson v. Gustafson and the other real estate agent cases supra; Mealey v. Bemidji Lumber Co., 118 Minn. 427, 136 N.W. 1090 (1912); or Canellos v. Zotalis, 145 Minn. 292, 177 N.W. 133 (1920), but all of those cases seem explicable under the rationale of Bowen v. Hall and Johnson v. Gustafson quotes it word-for-word.

The next English case, Temperton v. Russell, [1893] 1 Q.B. 715, is parallel on its facts to the most troublesome of the Minnesota cases in the third category, Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. 663, 63 L.R.A. 753 (1903). In that case, as in Gray, the labor union put pressure on a third party to stop dealing with the plaintiff in order to force the plaintiff to comply with union work rules. Although the defendant's motives were distinctly different [21] from those prescribed in Bowen v. Hall,[22] the defendants were held liable under the broader rationale that intentional and unjustifiable harm to rights under both existing and future contracts was actionable. This holding, which was relied on in Gray v. Building Trades Council, also broadened the tort from liability for procurement of breach of an existing contract to liability for interference with prospective advantage. Although the la-

16. See Sayre, footnote 15, supra.

17. See Prosser on Torts, 723 (2d ed. 1955).

18. Lord Brett, J., said in part, 6 Q.B.D. at 337:
"* * * [W]e were of opinion that the act of the defendants was done with knowledge of the contract between [A & B], was done in order to obtain an advantage for one of the defendants at the expense of the plaintiff, was done from a wrong motive, and would therefore justify a finding that it was done in that sense maliciously."

19. Lord Coleridge concluded his dissent with the following, 6 Q.B.D. at 344:
"I do not know, except in the case of Lumley v. Gye (1), that it has ever been held that the same person for doing the same thing under the same circumstances with the same result is actionable or not actionable according to whether his inward motive was selfish or unselfish for what he did. I think the inquiries to which this view of the law would lead are dangerous and inexpedient inquiries for courts of justice; judges are not very fit for them, and juries are very unfit."

20. "Merely to persuade a person to break his contract, may not be wrongful in law or fact as in the second case put by Coleridge, J. (4). But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act which is in law and in fact a wrong act if injury ensues from it." Q.B.D. at 338.

21. In speaking of the defendants' motives, Esher, L.J., said, [1893] 1 Q.B. at 725:
"They were not, I think, actuated in their proceedings by spite or malice against the plaintiff personally in the sense that their motive was the desire to injure him, but they desired to injure him in his business in order to force him *not to do what he had a perfect right to do*."

22. See footnote 18, supra.

bor unions won a slightly different type of case in Allen v. Flood, [1898] A.C. 1, the two subsequent leading English cases continued to articulate the broad rationale of Temperton v. Russell. Quinn v. Leathem, [1901] A.C. 495, was a secondary boycott case and South Wales Miners Federation v. Glamorgan Coal Co., [1905] A.C. 239, was an action in which the coal mines had engaged the miners on individual contracts and the labor union induced its members to breach these contracts to observe "stop-days" to decrease the supply of coal and increase their wages, which were based on the price of coal. The last important English case here is Steamship Co. v. McGregor, 23 Q.B.D. 598 (1889), aff'd [1892] A.C. 25. In this case the defendants were a combination of shipowners engaged in transportation between England and Chinese ports. The purpose of the combination was to exclude other competitors, including plaintiff, from the trade in order to maintain higher freight rates than previously charged. The combination offered low freight rates below profitable levels to drive plaintiff from the field; gave rebates to shippers who dealt exclusively with the combination; exerted pressure on defendants' agents to ship only by vessels of the combination; and carried cargo from ports served exclusively by the ships of the combination only when the shippers did not deal with plaintiff at ports served by both plaintiff's and defendants' ships. The plaintiff brought an action for damages and an injunction. A judgment for the defendants was affirmed by the House of Lords in an opinion which was heavily relied on in Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N.W. 1119, 21 L.R.A. 337 (1893), where the defendant trade association was allowed to boycott the plaintiff unless it acceded to the association's wishes. The opinions of the judges quite frankly recognized the clash of legitimate interests which was involved,[23] but the majority of the judges felt that the defendants had the right (subject to certain limitations) "to carry on their trade freely in the mode and manner that best suits them, and which they think best calculated to secure their own advantage." This, of course, is all that the defendant wishes to do in the instant case. Lord Esher, who had sided with the majority in Temperton v. Russell, dissented[24] in an opinion which is somewhat similar to Judge Sanborn's dissenting opinion[25] in Passaic Print Works v. Ely

23. BOWEN, L. J. "We are presented in this case with an apparent conflict or antinomy between two rights that are equally regarded by the law—the right of the plaintiffs to be protected in the legitimate exercise of their trade, and the right of the defendants to carry on their business as seems best to them, provided they commit no wrong to others."

24. LORD ESHER, M. R. [dissenting] " * * * The particular right of a trader—which we are considering—is his right to carry on his trade according to a free course of trade. The plaintiffs had that right on their side; but so also had the defendants on their side. The next question is, What will amount, as between rival traders, to an encroachment by the one on this right of the other? Each has a right to carry on his trade in a free course of trade, according to his own free will and judgment. So long as the one so carries on his trade, the other cannot, without infringing on the right of his rival, effectively complain. So long as each so carries on his trade, though such carrying on produces the utmost extent of competition, and consequent lowering of gain, neither can validly complain. Each is exercising the free course of trade. But if one goes beyond the exercise of the course of trade, and does an act beyond what is the course of trade, in order—that is to say, with intent—to molest the other's free course of trade, and which does molest the other's free course of trade, he is not exercising his own freedom of a course of trade; he is not acting in, but beyond, the course of trade; and then it follows that his act is an unlawful obstruction of the other's right to a free course of trade; and if such obstruction causes damage to the other, he is entitled to maintain an action for the wrong. * * * "

25. Judge Sanborn's opinion was cited in support of the Minnesota Court's holding in Tuttle v. Buck. It is also discussed in Carpenter, Interference with Contractual Relations, 41 Harv.L.Rev. 728, 759 (1928), where the author uses it as a

& Walker Dry Goods Co., 105 F. 163, 167 (8th Cir., 1900).

One of the early cases in this area is Walker v. Cronin, 107 Mass. 555 (1871), which was cited to the Court in Bowen v. Hall, 6 Q.B.D. 333 (1881). In that case the defendants tested by demurrer a complaint which alleged that the plaintiff, a shoe manufacturer, had employed and was about to employ persons to work, that the defendants induced these persons not to continue in or enter the plaintiff's employ, that the defendants further urged persons under contract to the plaintiff to make and deliver certain items to the plaintiff to return the raw materials to the plaintiff unfinished, that the defendants further urged one individual under contract of service to the plaintiff to leave this service and refuse to perform the contract, and that the plaintiff had been damaged by all of this. The trial court overruled the demurrer and the Massachusetts Court affirmed, reasoning that "the intentional causing of such loss to another, without justifiable cause, *and with the malicious purpose to inflict it,* is of itself a wrong," relying heavily on Keeble v. Hickeringill, 11 East 574, n., 103 Eng.Rep. 1127 (1707). (Emphasis supplied). The next significant case in Massachusetts is Vegelahn v. Guntner, 167 Mass. 92, 97, 44 N.E. 1077, 35 L.R.A. 722 (1896), relied on in the Minnesota Court's outlawing of the secondary boycott in Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. 663, 63 L.R.A. 753 (1903). In the Vegelahn case the Massachusetts Court approved the granting of an injunction which went beyond enjoining labor union pickets from violence and physical coercion of the plaintiff's customers or potential employees and enjoined two men on "patrol" from peaceful social intercourse with passersby for the purpose of informing them of labor's side of the controversy and urging them not to do business with the plaintiff or enter his employ.[26] The Court relied on Temperton v. Russell and distinguished the Steamship Co. Case. Judge (later Justice) Holmes dissented from the order approving the latter aspects of the injunction, directing himself first to the essential nature of the decision-making process in these cases. Conceding that one could not act for the purpose of harming another without justification, he first examined the weighing and balancing inherent in deciding the justification question in all such cases. 44 N.E. at 1080:

"It is on the question of what shall amount to a justification, and more especially on the nature of the considerations which really determine or ought to determine the answer to that question, that judicial reasoning seems to me often to be inadequate. The true grounds of decision are considerations of policy and of social advantage, and it is vain to suppose that solutions can be attained merely by logic and general propositions of law which nobody disputes. Propositions as to public policy rarely are unanimously accepted, and still more rarely, if ever, are capable of unanswerable proof. They require a special training to enable any one even to form an intelligent opinion about them."

He then took particular issue with the application of the rule stated in Walker v. Cronin to parties engaged in economic battle, arguing, as the defendants were to argue seven years later in Gray v. Building Trades Council, that the harm was not done for its own sake, "but as an instrumentality in reaching the end of victory in the battle of trade." He did not feel that labor disputes could be dis-

---

basis for his argument that damages for harm which is incidental to the principal purpose for which a person acts should not be recoverable under the tort of interference with contractual relations. Professor Carpenter's argument seems supported by the language used by the Minnesota Court in Tuttle v. Buck.

26. The Minnesota Court in Gray v. Building Trades Council stopped short of this point insofar as the defendant's direct picketing of the plaintiff in that case was concerned. See 97 N.W. at 668.

tinguished on the grounds that the conflict was not competition. 44 N.E. at 1081:

> "I have seen the suggestion made that the conflict between employers and employed was not competition. But I venture to assume that none of my brethren would rely on that suggestion. If the policy on which our law is founded is too narrowly expressed in the term "free competition," we may substitute "free struggle for life." Certainly, the policy is not limited to struggles between persons of the same class, competing for the same end. It applies to all conflicts of temporal interests."

He was not persuaded, as Justice Mitchell had not been in Bohn Mfg. Co. v. Hollis, that the combination of persons made their efforts otherwise unlawful for there had been "combination" in the Steamship Co. Case which "was essential to the success achieved." In what has turned out to be extremely prophetic language [27] he argued that he was unable to reconcile Temperton v. Russell with the Steamship Co. Case because he felt that the same freedom of action should be accorded the labor movement as was given to combinations of capitalists. This dissent was in the same vein as his earlier article, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 8 (1894), in which he had also criticized the Steamship Co. Case:

> "The ground of decision really comes down to a proposition of policy of rather a delicate nature concerning the merit of the particular benefit to themselves intended by the defendants, and suggests a doubt whether judges with different economic sympathies might not decide such a case differently when brought face-to-face with the issue."

Speaking of the "very serious legislative considerations which have to be weighed," he had cautioned against the prob-

27. "It is plain from the slightest consideration of practical affairs, or the most superficial reading of industrial history, that free competition means combination, and that the organization of the world, now going on so fast, means an ever-increasing might and scope of combination. It seems to me futile to set our faces against this tendency. Whether beneficial on the whole, as I think, it or detrimental, it is inevitable, unless the fundamental axioms of society, and even the fundamental conditions of life, are to be changed.
"One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of capital, to get his services for the least possible return. Combination on the one side is patent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way. I am unable to reconcile Temperton v. Russell (1893) 1 Q.B. 715, and the cases which follow it, with the Steamship Co. Case. But Temperton v. Russell is not a binding authority here, and therefore I do not think it necessary to discuss it.
"If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that, when combined, they have the same liberty that combined capital has, to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control. I can remember when many people thought that, apart from violence or breach of contract, strikes were wicked, as organized refusals to work. I suppose that intelligent economists and legislators have given up that notion today. I feel pretty confident that they, equally will abandon the idea that an organized refusal by workmen of social intercourse with a man who shall enter their antagonist's employ is unlawful, if it is dissociated from any threat of violence, and is made for the sole object of prevailing, if possible, in a contest with their employer about the rate of wages. The fact that the immediate object of the act by which the benefit to themselves is to be gained is to injure their antagonist does not necessarily make it unlawful, any more than when a great house lowers the price of goods for the purpose and with the effect of driving a smaller antagonist from the business." Vegelahn v. Guntner, 167 Mass. 97, 44 N.E. at 1081–1082 (1896) (dissenting opinion).

lems inherent is that sort of a decision making process,[28] problems which Justice Mitchell had foreseen in Bohn Mfg. Co. v. Hollis,[29] but which few courts of that day were able to see or willing to articulate.[30] The Vegelahn case is similar in principle to Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1916), which involved efforts by a labor union to unionize the mines of West Virginia. The operators had contracted with their employees that the mines would be run on a non-union basis, and the union approached the employees with the purpose of changing this scheme of things. The Supreme Court affirmed an injunction against the union leaders who, because of the language of the work contracts, could be deemed guilty of persuading an employee to leave his employer. The decision, which was dissented from by Justices Brandeis, Holmes and Clarke, has been ably analyzed by Professor Sayre, whose conclusions [31] as to the real issue bear a strong similarity to those of Justice Holmes concerning Vegelahn v. Guntner.[32] Ths Hitchman case was relied on in Roraback v. Motion Picture Mach. Operators' Union, 140 Minn. 481, 168 N.W. 766, 169 N.W. 529, 3 A.L.R. 1290 (1918), where the Minnesota Court refused to allow the defendant union to picket the plaintiff's theatre for a purpose only slightly stronger than had been permitted in the Steffes case.

These labor union cases are relevant here because of the nature of the plain-

28. "To measure them justly needs not only the highest powers of a judge and a training which the practice of law does not insure, but also a freedom from prepossessions which is very hard to attain. It seems to me desirable that the work should be done with express recognition of its nature. The time has gone by when law is only an unconscious embodiment of the common will. It has become a conscious reaction upon itself of organized society knowingly seeking to determine its own destinies." Holmes, Privilege, Malice & Intent, 8 Harv.L.Rev. 1, 9 (1894).

29. See footnote 6, supra.

30. The decision in R an W Hat Shop v. Sculley, 98 Conn. 1, 118 A. 55, 29 A.L.R. 551 (1922), is a decision in which the Court frankly concedes that the purposes of the defendant labor leaders were "legitimate and commendable" but concluded that the interests of the plaintiff employer who was being pressured by a secondary boycott *were superior to those of these defendants*." "Though the defendants' purpose was commendable, the means used to carry it through cannot be justified." 118 A. at 59 (Emphasis supplied).

31. Concluding that the fundamental question in the Hitchman case was whether or not one set of interests should be sacrified to another, Sayre, Inducing Breach of Contract, 36 Harv.L.Rev. 663, 695-96 (1923), the auditor said:
"To answer this deep lying problem, involving momentous social consequences, by a mere rule of thumb that the defendant induced a breach of the plaintiff's contract is hardly a method of determination calculated to produce justice.
"To the objection that the method of balancing interests robs the law of its predictability, one may answer that if a legal problem depends in the last analysis upon a question of policy, it will not make the law more predicable (sic) that the judges reach their determination through unconsciously following their own inarticulate intuitions rather than through a method of carefully setting "forth ·and then critically weighing the conflicting sets of recognized legal interests involved. The doctrine of Lumley v. Gye requires a determination of how great and what interests will be sacrificed to the interest of promised advantages; and this, whether courts choose to recognize it or not, is fundamentally and unavoidably a question of policy."
See also Harper and James on Torts, 497-98 (1955).

32. · Professor Sayre's remarks in the above footnote might indicate that he approved of the idea of balancing the conflicting interests according to the value placed upon them by the judges, but his general theme is that this tort is one that could rapidly be expended without careful analysis, see footnote 2, supra, and his conclusions seem to indicate that in the second category of Minnesota cases he would draw the line at the fact situation presented in Sorenson v. Chevrolet Motor Co. and not extend the doctrine to such cases as Johnson v. Gustafson. He also argues that the tort should not be extended to allow recovery for incidental harm to contractual relations. Sayre, footnote 31, supra, at 702-03.

tiff's case.[33] The plaintiff's opening statement at the trial described the instant case as "sounding in tort" but the plaintiff's complaint, in addition to pleading the interference with contract, alleged that the plaintiff's selling agreement with the Wood Company had been brought to the defendants' attention, that the defendants had declined to assume the agreement in any way, that the plaintiff has requested the defendants to take over the issue on a participation basis, and that the defendants "have failed and refused to do plaintiff the courtesy of answering its request, and have refused to honor any request of plaintiff for assistance in its position of financial jeopardy." This alternative theme is one which recurred throughout the trial. As part of the plaintiff's case in chief the plaintiff's corporate counsel testified at some length as to the efforts which he made to persuade the defendant to help the plaintiff. On cross-examination the witness testified that he asked the defendant at the minimum to enter into a participation agreement such as had been done with Craig-Hallum, Kinnard, Inc., and be available to take orders for the plaintiff's stock. Further testimony included the following:

"Q Well, did you ask them to engage in an active solicitation for the sale of this Continental Research stock?

"A I don't think that I got into the subject of active participation or active solicitation, but I'll tell you frankly I assumed that having taken over the St. Paul office, that they would have the decency to do it.

"Q You're talking about a sense of ethics at this point?

"A I'm talking about decency and the respect of one man for the personality of another.

"Q Mr. Palmer, did you at that time know that the only thing that Cruttenden, Podesta & Miller had bought were tangible assets for about $8,000?

"A I knew they had done that, but I knew also in doing so that they refused to take over any obligations of the Wood firm.

"Q And you knew that was perfectly clear in the so-called "buy-out"

33. Some might inquire why the labor union cases are not simply distinguished on their facts. One reason is that rationales developed in situations in which one type of motive was present have been transferred to other situations in which that sort of motive was not present. Thus, the Court in Temperton v. Russell, [1893] 1 Q.B. 715, purported to follow the rule in Bowen v. Hall, 6 Q.B.D. 333 (1881), though the motives of the persons charged were distinctly different. Compare footnote 18 with footnote 21. In other words, a rationale was transferred from situation # 2 (purpose to benefit the defendant at the expense of the plaintiff) to situation # 3 (purpose to harm the plaintiff only if the plaintiff does not yield to the defendant's wishes), speaking with reference to the Minnesota cases categorized in this opinion. Temperton v. Russell, of course, was relied on in Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. 662, 63 L.R.A. 753 (1903). Likewise, the Massachusetts Court in Walker v. Cronin, 107 Mass. 555 (1871), adopted the rationale of Keeble v. Hickeringill, 11 East 574, n., 103 Eng.Rep. 1127 (1707). Walker v. Cronin was apparently a labor union dispute, though the plaintiff's complaint, which was tested by demurrer, did not use those words. If Walker v. Cronin did involve a labor dispute, a rationale was transferred from situation # 1 (where there is usually only a single purpose to injure contractual relations, with a little good old-fashioned "malice" thrown in occasionally) to situation # 3 (where there is a purpose to harm only if the plaintiff does not relent to the defendant's wishes). Walker v. Cronin was followed by Vegelahn v. Guntner, 167 Mass. 92, 44 N.E. 1077, 35 L.R.A. 722 (1896), which was cited and relied on in Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. 663, 63 L.R.A. 753 (1903). It seems significant to note that Walker v. Cronin, which announces the rationale of situation # 1, was cited to the Court by counsel in Bowen v. Hall, 6 Q.B.D. 333 (1881), a situation # 2 case, but Walker v. Cronin was not relied on in the opinion in Bowen v. Hall.

agreement, Plaintiff's Exhibit 13–C, didn't you?

"A I knew it was perfectly clear. I never asked them to do anything else, —except to act like gentlemen, I thought."

The defendant's witnesses included Mr. Mayer and Mr. Podesta, two of the defendant's managing partners. Cross-examination of these witnesses by the plaintiff's trial counsel was directed toward the end of refuting the wisdom of every aspect of their decision not to assume the plaintiff's stock issue on a best efforts basis or to let their St. Paul office do so alone. The defendant's brief, though not conceding that it must show a justification for what it has done, argues alternatively that it was nevertheless justified under all the circumstances. The plaintiff's reply brief attacks the defendant's arguments and urges that if the Wood Company was in economic danger before the buy-out, it was saved by the transaction and that there is not one iota of evidence that the defendant was in such financial plight that it could not afford to permit its St. Paul office to handle the issue on a participation basis. The plaintiff, in short, contends that the defendant should have assumed the issue and is obligated to put on evidence to show why it should not have done so. The plaintiff asserts that it is not enough that the defendants "were serving an alleged right of their own." These are far reaching arguments.

It would be obvious, of course, that the plaintiff's tort action has contract implications, even if the plaintiff's pleadings, evidence and arguments did not expressly raise the issue. Possible tort liability would put future purchasers of assets such as the defendants here in the position of knowing that if they do not assume the liabilities of the acquired business, then they may have to pay damages in tort because the seller was thereby prevented from carrying out a contract with a third party such as the plaintiff here. This, of course, would thoroughly vitiate the supposed rule of corporation law that acquisition by purchase of assets, as compared to merger by exchange or purchase of stock, does not make the buyer responsible for the liabilities of the seller. Such a rule, however, is not inviolate, and the defendant has not claimed that it is. The defendant argues that possible liability here "would have the effect of restricting the freedom of the parties to contract *without any public policy to justify such a rule.*" (emphasis supplied). The plaintiff responds to this argument by asserting that the defendant had "no right" to put the Wood Company in a position where it could not perform its obligations and so the liability disclaimer clause in the buy-out agreement cannot serve the defendant as protection for the tort which it committed.

The plaintiff asked the defendant to assume the Wood Company's contract liability to the plaintiff, and the defendant declined to do so. The plaintiff now invokes the assistance of the legal process, seeking a result in tort it was not able to achieve in contract. There is nothing per se wrong with this in this particular situation, for there is possible authority in this State [34] and countless broad statements from others that might support liability here.

There have been more than a few broad statements made as to liability [35] in this

34. See footnote 35, infra.

35. For example, Professor Carpenter has said, " * * * [E]ven in the absence of force, fraud, or illegal means, a defendant is liable where he does an act *without any purpose of inducing the breach* but which he knows will cause a breach and does cause one (citing Twitchell v. Glenwood-Inglewood Co., 131 Minn. 375, 155 N.W. 621. (emphasis supplied).

Interference With Contractual Relations, 41 Harv.L.Rev. 728, 736 (1928). At page 747, it was further said: " * * * [I]f the defendant enters into contract with a person, who is already under contract with the plaintiff, with knowledge of the existence of the prior contract and of the fact that performance to the defendant will prevent performance to the plaintiff, he is merely furthering his interest to enter into contracts and he should

area of the law, not to mention those that beg the question. The method of deciding the presence or absence of justification has also been described in sweeping terms.[36] In addition to notions that courts are to balance the interests of the respective parties,[37] using their "good sense," [38] "reason and justice," [39] or their views on the "social import" [40] of the interests involved, it is sometimes implied that furtherance of one's own interests will not justify some interference with another's contractual relations. It is true, as Chief Justice Warren has said off the bench, that our law "floats in a sea of ethics." [41] It is true that integrity and a concern for what is morally right and wrong are social values which have been held high throughout the history of our nation and should continue to be so esteemed. But the Minnesota Court, to which this Court must look for guidance, has not yet held that one must be generous in addition to being just—that one must sacrifice one's own interests to those of another. In fact, Justice Mitchell made a statement quite to the contrary in Bohn Mfg. Co. v. Hollis [42] and Justice Holmes' dissent in Vegelahn v. Guntner is to the same effect.[43] It is particularly unpleasant to make these observations in this case, for the demeanor and bearing

not only be able to recover on the contract which he has made, but should be liable for inducing breach of contract or be enjoined from interference, even though the prior contract does not give the third person a property interest." (Citing Swaney v. Crawley, 154 Minn. 263, 191 N.W. 583 (1923)).

36. As to justification for interference, the above author opined that, "Whether a privilege of invasion exists depends upon whether it is of greater moment to society to protect the defendant in the invading activities than it is to protect and guard the plaintiff's interests from such invasions. An evaluation and balancing of the social import of the conflicting interests of the respective parties and of the social interests per se are involved." Carpenter, note 35, supra, at 745.

37. See footnote 36, supra, and the language of the Connecticut Court, footnote 30, supra.

38. "Whether the defendant's interest, for the protection of which he causes loss to the plaintiff, is 'inferior' or 'superior' is to be determined by evaluating the social importance and significance of the two interests. There is no rule of thumb to be applied in every case. The good sense of the tribunal must be employed to analyze the circumstances and determine in each case on which side of the line it falls." 1 Harper & James on Torts 515 (1955).

39. Dean Green, an able scholar who has made invaluable contributions to tort law, has analyzed this field from the standpoint of the respective interests involved and has concluded (and history may prove him right) that "reason and justice" are the only ultimate guides in this area.

In the second of a series on Relational Interests, he said in part, 29 Ill.L.Rev. 1041, 1049 (1935):
"* * * to designate interferences with the relation as 'privileged' or 'justified' in no way solves the problem. It merely poises the problem for solution. The factors that determine the solution are at large, and while they can be and are reduced to formulas, the formulas themselves are so elastic as to permit the widest leeway for a court's judgment. Judicial language is plentiful, varied, and colorful, but government here as elsewhere is limited by the intelligence of the agency to which its power is committed. The ultimate question in any particular case is: How does the court value the respective interests subject to its power? This is beyond the range of arbitrary rules and formulas and colorful phrases, and in the realm of what we like to call 'reason and justice.' Reason and justice are, of course, not always safe guides for the settlement of disputes, but historically they have been the best we have had. * * *."
See also 29 Ill.L.Rev. 460 (1934); 30 Ill.L.Rev. 1 (1935).

40. See footnote 36, supra. In fairness to Professor Carpenter, it should be pointed out that his article was written 35 years ago and it should definitely be noted that he argued that there should not be tort liability where the harm caused was incidental to the result desired by the actor. See footnote 25, supra.

41. See The Nation, Vol. 196, p. 453, June 1-8, 1963.

42. See footnote 7, supra.

43. See footnote 27, supra.

of the plaintiff's chief witness, its corporate counsel, reflected deep rooted moral character of a sort not often seen in a court of law. But the defendant's managing partners gave every indication of being honorable men also, and their interests are at stake here too.

It is conceded that in approaching these interference problems courts have to first take a broad look at all of the circumstances and see what motives were present, what means were used, what interests were involved, and perhaps other factors as well. It is inevitable, as Justice Holmes pointed out, that in some of the cases [44] in the first category in this opinion, the courts have to consider the character of the interests of the respective parties and their "social advantage." See, e. g., Faunce v. Searles, 122 Minn. 343, 142 N.W. 816 (1913); Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 205 N.W. 630, 206 N.W. 396 (1925). This is also going to be true in the second category of cases, particularly when the benefit to the defendant by its interference is less than the corresponding detriment to the plaintiff. See, e. g., Twitchell v. Glenwood-Inglewood Co., 131 Minn. 375, 155 N.W. 621 (1915); American Surety Co. v. Schottenbauer, 257 F. 2d 6 (8th Cir., 1958); compare Sayre, footnote 32, supra. It is certainly desirable, as Justice Holmes said, "that the work should be done with express recognition of its nature." 8 Harv.L.Rev. at 9. But when the courts are faced with situations involving concededly legitimate motives, see R an W Hat Shop v. Sculley, 98 Conn. 1, 118 A. 55, 29 A.L.R. 551 (1922) (footnote 30), where harm results only incidentally from actions taken solely to further the interests of the actor, then that is another matter. In this situation a decision can only be reached by weighing the respective interests of the parties and attaching a higher value to one interest or to the other. As Justice Holmes has taught us, that is what happened in the third category of cases described herein, and that is essentially the chore the plaintiff here is asking this Court to undertake. There are a number of interests involved here. The plaintiff is asserting the "interest of the individual in the security and integrity of contractual relations into which he has entered." Harper, Interference With Contractual Relations, 47 Nw.U.L.Rev. 873, 874 (1953). The defendant is asserting its "interest in freedom to enter contractual relations." Carpenter, Interference with Contractual Relations, 41 Harv.L.Rev. 728; 747 (1928). There is also, the interest of the owners of the Wood Company in stopping their losses, so that they can pay their creditors, who are a fourth class of persons who have an interest in this sort of an affair. The Wood Company's employees must be considered also, for they would doubtless like to move to other jobs if they are to lose the ones they now have. The question of when or whether the defendant should have bought the assets of the Wood Company involves a reconciliation of the interests of each class. It would seem that the interests of the two parties to this action are squarely juxtaposed, with little basis for favoring one or the other save rough notions of right and wrong articulated under the guise of policy. If this is true, we should not forget Holmes, who told us that: "Questions of policy are legislative questions, and judges are shy of reasoning from such grounds," [45] and that: "To measure them justly needs not only the highest powers of a judge and a training which the practice of law does not insure, but also a freedom from prepossessions which is hard to attain." [46] The defendant has paraphrased all of this by its argument that there is "no public policy" to justify possible liability

---

44. "If the defendant acted solely for the purpose of causing harm to the plaintiff and not to advance any interest of his own, a third person, or the public, there is no privilege for the obvious reason that deliberate injury to a legally protected interest of another cannot be justified by the mere desire to injure." 1 Harper and James on Torts 513 (1955).

45. Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 3 (1894).

46. Ibid., at 9.

here. As the defendant has the wisdom of Justice Holmes' dissent in Vegelahn v. Guntner for support, this Court is inclined to agree and feels that the Minnesota Court would also.

The question is not one of prediction as to whether courts competent to do so will ever reconsider Bohn Mfg. Co. v. Hollis, Gray v. Building Trades Council or the Steamship Co. Case and Temperton v. Russell, their counterparts in the English cases. Decisions which have collected numerous precedents about them are seldom disturbed, save only for the most compelling reasons. Compare Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The only question here is whether since the facts do not bring the case within the rationale of Tuttle v. Buck or Johnson v. Gustafson or like cases, the Minnesota Court would approach this problem as one to be decided by weighing one interest against the other. The instant case appears to be the first one in which it has been urged that there has been an unlawful interference with contract by one who buys the assets and hires the salesman of a second party who is under contract to do work for a third, the first party not being a competitor of the third. Compare Twitchell v. Glenwood-Inglewood Co., supra.

Orienting this case to the guidelines laid down by the decisions, the following facts seem germane: the defendant here did not intentionally procure the breach of an existing contract. Snowden v. Sorenson, 246 Minn. 526, 75 N.W.2d 795 (1956). The defendant did not act with a motive or purpose to injure the plaintiff. See Tuttle v. Buck, supra, and Keeble v. Hickeringill, 11 East 574, n., 103 Eng.Rep. 1127 (1707). So there is no need to inquire whether there was a justification for its acts. Faunce v. Searles, 122 Minn. 343, 142 N.W. 816 (1913); Heffernan v. Whittlesey, 126 Minn. 163, 148 N.W. 63 (1914); Wolfson v. Northern States Management Co., 210 Minn. 504, 299 N.W. 676 (1941). The defendant here did not act for the purpose of appropriating for itself the advantages which another had secured by contract. Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35 (1927); Beekman v. Marsters, 195 Mass. 205, 80 N.E. 817, 11 L.R.A., N.S., 201 (1907); Bowen v. Hall, 6 Q.B. D. 333 (1881). Nor did it interfere with the plaintiff's contractual relations with the purpose of furthering its own interests at the expense of the plaintiff's interests. Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252 (1938); Joyce v. Great Northern Ry., 100 Minn. 225, 110 N.W. 975, 8 L.R.A.,N.S., 756 (1907). The defendant did not use wrongful means to vie with a competitor for the trade of a third party, Victor Talking Machine Co. v. Tucker, 128 Minn. 171, 150 N.W. 790, 792-793 (1915), and the defendant did not interfere with the plaintiff's prospective advantage with an unjustified purpose to injure. Carnes v. St. Paul Union Stockyards, 164 Minn. 457, 205 N.W. 630, 206 N.W. 396 (1925); cf., Temperton v. Russell, [1893] 1 Q.B. 715. The defendant did not use misrepresentations or "questionable inducements" to cause the Wood Company to incapacitate itself from being able to perform its contract with the plaintiff, Swaney v. Crawley, 154 Minn. 263, 191 N.W. 583 (1923), nor did the defendant inadvertently cause the breach by outrageous and reprehensible conduct. Sandlin v. Coyle, 143 La. 121, 78 So. 261, L.R.A.1918D, 389 (1918); Woodward v. Washburn, 3 Denio 369 (N.Y.1846). The interference with the plaintiff's contractual relations was caused by actions which were taken for normal business reasons in furtherance of its own interests. Insofar as the Minnesota cases can be reconciled according to the motives of the defendants in the respective cases, the instant case is outside the boundaries delineated by the Minnesota decisions in the first two categories mentioned previously. It seems plain that to allow an action for interference with contractual relations in the context presented by this case is in actuality to force the prospective purchaser of a business to decline to proceed with the transaction when disappointed contract obligees object or to assume a contract

obligation which it might possibly carry out but which in its business judgment it does not wish to do, putting its own interests above those of strangers. A judicial decision when or whether the defendant should have purchased the Wood Company's assets and hired its salesmen would now involve a weighing of five conflicting interests: Those of the defendant; the plaintiff; the owners of the Wood Company; the Wood Company's creditors; and the Wood Company's salesmen. The defendant has made the above decision for itself and the plaintiff questions the wisdom of the decision and met its underlying motives or purposes. The third category of cases aside, there is nothing in the Minnesota decisions which requires such a review of controversies involving conflicting economic and social considerations, and there would appear to be sound reasons for not initiating the use of the balancing-of-interests approach in the factual context presented here. See Vegelahn v. Guntner, 167 Mass. 92, 44 N.E. 1077, 35 L.R.A. 722 (1896) (dissenting opinion; Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 3–9 (1896). To find tort liability in some cases would be in effect to have the courts do for the plaintiff what he could not do for himself in the free barter of the market place, i. e., have the defendant assume the task of selling the plaintiff's stock. This result, in addition to being ironic to some, would be more than surprising to careful corporate counsel throughout the land, who, as the defendant has pointed out, have for years attached legal significance to a liability disclaimer in drafting a contract to purchase assets. The rule of corporation law may very well be changed some day, but if and when that day comes, it seems clear that the reasons for the change will be considerably stronger than any which have been presented in support of possible liability for what the defendant has done here. For these reasons, the interference to the plaintiff's contractual relations must be described as incidental and not of the sort which can be the basis for liability in tort.

It must be conceded that analysis of the cases from the standpoint of motive appears in but few of the decisions. Dean Prosser has observed that the development of the law has been accompanied by confusion, uncertainty and disagreement. He concludes, however, that analysis of the language of the courts to determine the rationale of the decisions suggests that most of the formulae have turned on the question of the defendant's motive. Prosser on Torts 721 (2d ed. 1955). Two other highly regarded scholars have stressed the importance of motive in these cases. 1 Harper and James on Torts 515 (1955):

"The purpose of the defendant may be, and frequently is, the controlling factor in the determination of the existance of a privilege, since it usually discloses the interests involved and makes possible their evaluation by the court."

Dean Ames of the Harvard Law School, who prophesied the result in Tuttle v. Buck,[47] said much the same thing in a general statement which has well stood the test of time. Ames, How Far An Act May Be a Tort Because of the Wrongful Motive of the Actor, 18 Harv.L.Rev. 411, 412 (1905):

"The wilful causing of damage to another by a positive act, whether by one alone, or by several acting in concert, and whether by direct action against him or indirectly by inducing a third person to exercise a lawful right, is a tort unless there was just cause for inflicting the damage; *and the question whether there was just cause will depend in many cases, but not in all, upon the motive of the actor.*

"The motive to an act being the ultimate purpose of the actor is rightful if that purpose be the benefit of others or of himself, wrongful if the purpose be damage to another. (Emphasis supplied.)

47. See footnote 4, supra.

Dean Ames' article shows that the imposition of civil damages or the affecting of other rights on the basis of motive is a concept which extends throughout our law. The same idea is advocated in Bohlen, Incomplete Privilege to Inflict Intentional Invasions of Interests of Property and Personalty, 39 Harv.L.Rev. 307 (1926):

> "There is nothing better settled than that an act which normally has certain legal effects may have very different effects if done for some particular purpose."

See also Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1, 2, 5 (1894); Holmes, The Common Law 130–144 (1881). The American Law Institute, which doubtless regards such cases as Gray v. Building Trades Council as having been vitiated by history [48] and subsequent statutory enactments, seems to take the position that there can be no tort liability for interference with contract without a purpose to injure.[49] Professor Carpenter, as already noted,[50] placed considerable emphasis on the actor's motive in one portion of his article and concluded that incidental interference should not be tortious.[51] Professor Sayre's comments on *inducing* breach of contract are to the same effect.[52] The cornerstone of the tort may very well not be the motive with which the person sought to be charged has acted, but the Minnesota decisions do seem reconcilable on that basis. Examination of *all* the cases was necessary because of the similarity of the facts of some of the cases,[53] and the possible application of the principles of others, particularly Gray v. Building Trades Council. This case could have been distinguished on its facts, but there is ample precedent for transferring rationales from one fact situation to another.[54]

For all of the foregoing reasons it is clear that the plaintiff would not be entitled to damages even if legal damages had been proved, which they were not. The plaintiff, undoubtedly the owner of a good product and a good idea, failed in its financing effort because of circumstances beyond the control of either the Wood Company or the defendant. Several years from now there might again be the kind of local market for speculative ventures in which investors will readily invest their money.

In accordance with Rule 52 of the Rules of Civil Procedure the Court adopts the foregoing memorandum as its Findings of Fact and Conclusions of Law. The defendants are entitled to judgment.

### ORDER FOR JUDGMENT

Judgment will be entered for defendants.

---

48. "Combinations of workmen for mutual aid and protection are no longer regarded as necessarily criminal or civil conspiracies." Restatement, Torts, § 776, comment a. See also comment e to § 777: "The object of concerted action must not be confused with the motives which lead workers to desire it."

49. " * * * [O]ne who, without a privilege to do so, induces or otherwise *purposely* causes a third person not to
 (a) perform a contract with another, or
 (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." (Emphasis supplied.) Restatement, Torts § 766.

50. See footnote 25, supra.

51. "There exists a broader privilege to invade an interest in contract relations when the interference is indirect and incidental. Thus, one is privileged to invade an interest in contract relation in protection of his interest in freedom to enter into contracts, or to protect economic advantages of less importance than interests in contract relations, where such invasion is not for the specific purpose of invading the interest in question but is merely incidental." Carpenter, Interference with Contract Relations, 41 Harv.L.Rev. 728, 763 (1928).

52. See footnote 32, supra.

53. See footnotes 34 and 35, supra, and accompanying text.

54. See footnote 33, supra.